
IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs January 18, 2017 at Knoxville

## ERIC BLEDSOE v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 09-06393        Chris Craft, Judge**

_____

### No. W2016-00419-CCA-R3-PC

_____

The Petitioner, Eric Bledsoe, appeals as of right from the denial of his petition for post-conviction relief, wherein he challenged his conviction for aggravated rape, aggravated burglary, and theft of property valued at $1,000 or more but less than $10,000. See Tenn. Code Ann. §§ 39-13-502; -14-103; -14-403. On appeal, the Petitioner contends that his attorney provided ineffective assistance of counsel by failing to call potential defense witnesses during trial and failing to adequately investigate the Petitioner's mental health history. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Terrell L. Tooten, Memphis, Tennessee, for the appellant, Eric Bledsoe.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Marianne L. Bell, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL BACKGROUND

On October 8, 2009, the Shelby County Grand Jury indicted the Petitioner of one count of aggravated rape, one count of aggravated burglary, and one count of theft of

property valued at $1,000 or more but less than $10,000. On April 16, 2012, the Petitioner's case went to trial, and the jury convicted him as charged. At the subsequent sentencing hearing, the trial court sentenced the Petitioner to an effective sentence of sixty-five years to be served in the Tennessee Department of Correction. On direct appeal, the Petitioner challenged the sufficiency of the evidence supporting his aggravated rape conviction, and this court affirmed the judgment of the trial court. See State v. Eric Bledsoe, No. W2012-01643-CCA-R3-CD, 2013 WL 3968780, at *1 (Tenn. Crim. App. July 31, 2013).

In its opinion, this court summarized the facts of this case as follows:

C. O. ("the victim") testified that the incident took place on May 18, 2009. At the time, she was residing in a townhome at 303 Bishop Drive, Memphis, Tennessee. The previous night the victim left her downstairs kitchen window partially open. She awoke at approximately 5:00 a.m. to what she described as a "creeping noise." The victim initially thought the noise was her young son moving around the house, but when she looked out of her bedroom door, she saw a man on all fours just outside her bedroom. The intruder was dressed in a brown denim jacket, jeans, a red baseball cap with an "A" on it, and a "dewrag." At trial, the victim identified the [Petitioner] as the intruder who entered her home that night.

The victim testified that she did not react immediately upon seeing the [Petitioner] because she was in shock. When the [Petitioner] realized he had been seen by the victim, he stood up, entered the bedroom, turned the lights on, and stood over the victim's bed. The [Petitioner] told the victim, "I'm not going to hurt you. I want some." The victim understood his words to mean he "wanted sex," and she immediately began kicking and hitting him. In response, the [Petitioner] placed both hands around the victim's neck and choked her until she was unconscious. When the victim regained consciousness, the [Petitioner] was gone, and she noticed that her underwear had been pushed to the side.

After rearranging her underwear, she went to her son's room to make sure he was unharmed, and from her son's window she saw that her vehicle was missing. The victim then went downstairs to check the rest of her home and discovered that her car keys, student identification, some money, and her driver's license were missing from her purse. She noticed her kitchen window was completely open, and the screen over the kitchen window was missing. The victim called her mother and 911. After police arrived at the scene, the victim was transported to the Memphis Sexual

Assault Resource Center ("the Rape Crisis Center"), where Dr. Amanda Taylor conducted a full physical examination of the victim. The victim's injuries were photographed, DNA samples were taken for a rape kit, and she was given a Plan B pill. The underwear the victim had been wearing during the incident was kept by the Rape Crisis Center as part of the rape kit. After leaving the Rape Crisis Center, the victim worked with a sketch artist to create a composite picture of her attacker, and she also gave a statement to police.

On cross-examination, the victim denied knowing the [Petitioner] prior to the attack. When questioned about why she failed to state, in a written statement made during a photo identification three days after the crime, that the [Petitioner] had assaulted or sexually assaulted her, the victim testified that she still was too distraught and that she already had told the police that she had been sexually assaulted.

Dr. Amanda Taylor, a sexual assault nurse examiner at the Rape Crisis Center, testified as an expert witness in forensic nursing and sexual assault examinations. The victim arrived at the Rape Crisis Center at 9:30 a.m. on May 18, 2009. Dr. Taylor explained that the procedure following a victim's arrival at the Rape Crisis Center is to first talk to the patient with an advocate present, then to do a full physical examination, collect "labs," administer medications, and collect a rape kit. Any injuries a victim might have are photographed. In this case, the victim had injuries both to her neck and thighs, and they were fresh injuries at the time of the physical examination. The victim also had a genital examination, which involved both an internal and external examination. The victim did not have any injuries to her genitals. Dr. Taylor testified that women commonly do not have any genital injuries after being sexually assaulted and that 80% of sexual assault victims do not show injuries in their genital area. Dr. Taylor collected a rape kit consisting of four swabs from the victim's mouth for baseline DNA, four swabs from the "vulvar area," and four swabs from the internal genital area. The kit also included the victim's underwear. Dr. Taylor testified that, after a kit has been collected, all of the evidence is sealed and sent to the Tennessee Bureau of Investigation ("TBI") for analysis. The kits are kept in a secure location until they are transported to the TBI.

On cross-examination, Dr. Taylor explained that the advocate who is present during the initial interview at the Rape Crisis Center is there to explain to a victim the legal proceedings involved. The advocate is not

present for the medical exam. Dr. Taylor confirmed that the victim did not have any injuries to her genitals and that she could neither confirm nor negate sexual abuse had taken place. The victim's statement taken at the Rape Crisis Center did not include anything about her underwear being awry after she recovered from unconsciousness. On redirect, Dr. Taylor confirmed the victim's injuries were consistent with the statement the victim gave at the Rape Crisis Center.

Dyane Karl, a forensic technician with TBI, testified that it is her job to receive and label evidence and then place it in the TBI's vault until it is ready to be analyzed. Karl testified that the TBI will not accept evidence that is either unsealed or not delivered by law enforcement. She received the sealed rape kit taken from the victim's examination from Hyun Kim, a Memphis Police Department ("MPD") officer. Karl testified that Francesca Sanders, who also worked as a forensic technician at TBI, received the DNA standard swabs of the [Petitioner] from Officer Kim.

Donna Nelson, a special agent forensic scientist assigned to the serology[, and] DNA unit with the TBI, testified as an expert witness in the area of DNA analysis. Her job at the TBI was to process evidence for DNA and test any DNA evidence for possible matches. After receiving the rape kit, Special Agent Nelson first tested the vaginal swabs for the presence of semen. The vaginal swabs tested negative for the presence of semen. The vulvar swabs were then tested for the presence of alpha amylase, an ezyme found in saliva. The tests returned positive results for the presence of alpha amylase. Because alpha amylase is found in other substances, its presence only indicates the possibility of the presence of saliva, and is not conclusory. The victim's underwear tested positive for the presence of semen, on the inside of the underwear, in the "front of the crotch area." After these tests were performed, the evidence was returned to the TBI's evidence vault, and Special Agent Nelson requested a DNA standard from the [Petitioner]. The semen found on the victim's underwear was matched to the [Petitioner's] DNA. Dr. Taylor's report on the DNA test results stated that the "probability of an unrelated individual having the same DNA profile from either the African American, Caucasian, Southeastern Hispanic or Southwestern Hispanic population exceeds the current world population."

Marvin Pender, a supervisor at Memphis Police Communications, testified that the victim made an emergency call on May 18, 2009. His testimony was based on a 911 chronology record. The dispatcher initially

classified the call as a "prowler call," but after talking with the victim, the dispatcher discovered the victim was sexually assaulted, and the call was changed to criminal assault. A dispatch to the victim's home was made at 5:37 a.m.

Officer James Henderson of the MPD responded to the victim's 911 call first. The victim told Officer Henderson that she had been sexually assaulted and that she suspected the intruder had entered her home through the open kitchen window. Officer Henderson observed that the window was open and that its screen was on the ground outside. He also noticed injuries on the victim's arm and neck. Officer Henderson took a description of the victim's assailant, and noted that her car, keys, and student identification had been stolen.

Officer David Galloway, a crime scene unit officer with the MPD, photographed the crime scene and processed the kitchen window's sill for fingerprints. He also processed the window screen and sent it to the crime lab to be dusted for fingerprints. The screen was not processed at the scene because Officer Galloway determined that, due to the nature of the window screen, better fingerprints could be obtained in the crime lab.

Sergeant Roger Wheeler of the MPD was a part of crime scene investigation at the time of the incident. He obtained three fingerprints from the window screen, and sent those fingerprints to be examined by a latent print examiner.

Officer Archie Rudd of the MPD received a call over his radio to be on the lookout for the victim's Jeep. A vehicle matching the description was located on the lot of a Mapco. A witness at the scene informed Officer Rudd that a black male had been attempting to change the tire on the vehicle. The Jeep was still on a jack when officers arrived on the scene, and a tire was pushed under the vehicle. After talking to witnesses, Officer Rudd then went to a nearby McDonald's. He attempted to use the restaurant's surveillance cameras to identify the suspect and also located another tire from the Jeep in a dumpster behind the McDonald's. Officer Rudd then returned to the Jeep and had it towed to the city impound lot. Officer Rudd testified that either he or his trainee was the one to fill out the paper work for towing the Jeep. Officer Rudd testified that he stands over his trainees' shoulders and makes sure any paperwork they fill out is correct.

Sergeant Ricky Davison of the MPD testified that he processed the victim's Jeep after it was towed. He photographed the vehicle and also dusted the exterior for fingerprints. The photographs were taken before and after he dusted the outside. Sergeant Davison found fingerprints on the exterior of the passenger door. The Jeep's rear view mirror had been torn off, and it was located on the rear passenger floorboard. Sergeant Davison obtained fingerprints from the rear view mirror.

Martin Milner, a civilian employee of the MPD's crime scene investigation latent print unit, testified as an expert in latent print examination. Milner received all of the fingerprint evidence collected by MPD officers from the crime scene and from the victim's Jeep. Milner determined that seven of the fingerprints collected by law enforcement officers were "of value." The fingerprints of value were then compared to known fingerprints using the automated fingerprint identification system ("AFIS"), a computerized database of known fingerprints. The AFIS returned a single identification number, 248804, as a match to the fingerprints taken from the crime scene. This number had previously been assigned to the [Petitioner]. Milner manually compared the fingerprints after they were scanned using the AFIS. Two fingerprints from the torn rear view mirror matched a known print of the [Petitioner] on more than ten points of comparison. A thumb print taken from the victim's window screen matched the [Petitioner's] known fingerprint on seven points of comparison. A palm print taken from the passenger door of the victim's vehicle matched the [Petitioner] on six points of comparison. Milner testified that he preferred not to make a comparison with less than five points of comparison matching and that he felt very comfortable in saying there was a match when seven points of comparison matched. He did not like "to go below five" points of comparison when identifying matching fingerprints.

On cross-examination, Milner confirmed his preferences for the number of matching points when making an identification. Milner stated that he would still report an identification between fingerprints when only four points matched but explained that four matching points neither confirmed nor negated a match.

Debra Finley, a fingerprint technician working for the Shelby County Sheriff's Office, testified as an expert witness in fingerprint identification. She testified that fingerprints taken from the [Petitioner] the day of the trial were the "exact same" as the fingerprints already on file for

the [Petitioner] on between seven to ten different comparison points. The file number attached to the previously known fingerprints was 248804. The comparisons were made using the right thumb print and the right index finger. On cross-examination, she admitted there are more than ten points for comparison when identifying fingerprints.

Mark Workman, a composite layout artist with MPD's photo laboratory, testified that he developed a sketch of the victim's assailant during an interview with the victim in his office based on the description given to him by the victim. Workman's process is to begin creating a sketch using a description given to him without looking at photographs. He continuously shows the image to whoever is describing the person until they do not wish to make any more changes. Once the picture is complete, it is sent to the investigating officer.

Lieutenant Angela Smith of the MPD was the lead investigator on the case. At the time of the investigation, she held the rank of sergeant. Lieutenant Smith responded to the victim's home, and she also responded when the victim's Jeep was found. She took the victim's statement after she had been examined at the Rape Crisis Center, and she was also responsible for circulating the composite sketch of the suspect. After the fingerprints taken at the crime scene and from the Jeep were matched to the [Petitioner's] fingerprints, Lieutenant Smith created a photo array that included a photo of the [Petitioner] and presented it to the victim. The victim identified the [Petitioner] from the photo array.

After the [Petitioner] was arrested, Lieutenant Smith interviewed him, took his statement, and obtained a DNA swab. Lieutenant Smith testified that the [Petitioner] was aware of his rights when he gave his statement. The [Petitioner's] statement included the following:

> I open the window up went in and I was looking around and I went upstairs and in this room and when I got in the room the lady woke up and I start talking to her asking her questions and stuff and when I got in the room I seen [sic] her butt naked then I started talking to her asking where her boyfriend was and what she was doing naked. Then she told me he had just left then we were still talking and I asked her if she could give me a few dollars to get something to eat cause I was high then she started screaming and stuff and I told her don't be yelling cause [sic] I wasn't going to do

-7-

anything to her and then yelling and kicking and then she kicked me in my stomach and I grabbed her leg and tried to calm her down then she swung at me so after that I opened her legs up and had sex with her but I took it out before I had ejaculated. I took it out and did it on the bed I didn't have a condom on when I left out of there I got her keys from off the table and drove off.

When the [Petitioner] was asked if there was anything else he wanted to add to his statement, he stated, "I really apologize for what I did because I wasn't in my right mind, I sorry [sic] I did [sic] her like that that is not me."

Officer Andy Hurst of the MPD worked in the sex crimes division at time of the incident. He was asked by then-sergeant Smith to help her take a statement from the [Petitioner]. Officer Hurst testified that the [Petitioner] never appeared to be confused, "out of his mind," under the influence, or uncooperative during his police interview. At one point during the interview, the [Petitioner] asked Lieutenant Smith to leave the room. After she had left the interview room, the [Petitioner] immediately began crying and stated it "wasn't like him" to do what he had done. The [Petitioner] blamed his actions on the "pills and alcohol" that he had consumed. After this admission, Officer Hurst determined it would be best to get a statement from the [Petitioner], and he notified Lieutenant Smith to return to the interview room so they could take the [Petitioner's] statement. On-cross examination, Officer Hurst testified that the statements the [Petitioner] made while Lieutenant Smith was absent from the room were not included in his written statement because they were "covered in the narrative."

The [Petitioner] did not testify, and the defense did not call any witnesses.

Bledsoe, 2013 WL 3968780 at *1-6.

The Petitioner timely filed a pro se petition for post-conviction relief, and upon appointment of counsel, an amended petition was filed. The post-conviction court held a bifurcated evidentiary hearing, which took place on three different dates: May 28, 2015; July 10, 2015; and August 28, 2015.

*I. May 28, 2015 Post-Conviction Hearing*

-8-

On May 28, 2015, the Petitioner explained that he had concerns regarding his trial counsel's representation. The Petitioner claimed that he did not speak with trial counsel regularly, claiming that they spoke "mainly when [the Petitioner] came to court and a couple of times [when trial counsel] came to the jail." The Petitioner said that trial counsel visited him "twice" while he was in jail. He asserted that there were matters trial counsel told the Petitioner he was working on, but the Petitioner never received updates from him. He contended that trial counsel "left [him] in the dark" on matters concerning his case.

The Petitioner also testified that he had concerns regarding the victim's testimony about the Petitioner and her relationship with him. The victim asserted that she had never met the Petitioner, but he claimed that he and the victim knew each other prior to the night of the attack. He said that he informed trial counsel that he and the victim were "in a pre-existing relationship" and that he had "moved out" of her home. The Petitioner insisted that he and the victim were "[b]oyfriend and girlfriend." The Petitioner explained that he would have called witnesses to testify at trial regarding his relationship. He claimed that he wrote a letter to his trial counsel in which he asked trial counsel to contact Veronica White, James Bledsoe, and Lois Bledsoe about testifying at his trial. However, according to the Petitioner, he never received a response to this request from his attorney.

When asked if he had the opportunity at trial to confront the victim about her truthfulness, the Petitioner responded "[n]o" and explained that "[trial counsel] never asked [him] anything" about what the victim "stated." He further explained that if trial counsel had "subpoenaed witnesses that [the Petitioner] asked [trial counsel] to call on [his] behalf to testify that [he and the victim were] together" and that they had "seen [them] together and know[n] that [they were] staying together, [then trial counsel] would have known that [the Petitioner] and [the victim] had a relationship."

Additionally, the Petitioner testified that he suffered from mental illness. He explained that he had "PTSD, paranoid schizoaffective disorder, depressive disorder, and probably substance dependence." The Petitioner agreed that he had received a mental health evaluation prior to his trial but explained that he had trouble understanding the process and his evaluator "got frustrated with [him]."

Furthermore, the Petitioner claimed that trial counsel "never brung [sic] up [his] mental illness that [he] told [trial counsel] about." He insisted that his mother, Lois Bledsoe, could have verified that he suffered from mental illness. The Petitioner stated that he relayed this information to trial counsel, but never got a reply from him. The Petitioner explained that he had dealt with mental illness problems "[s]ince [he] was a kid" and agreed that "in order to function" he had "to have [his] medication."

Additionally, the Petitioner stated that his medication had been "upgraded" during his time in jail regarding this incident.

The Petitioner also expressed concern about how trial counsel handled "statements he might have made during the time that he was under the influence" and "wasn't on [his] medicine." He explained that at the time he was arrested, he had not been taking his medication. He stated that when the police began talking to him, he "told them that [he] was not in [his] right mind[,]" that he "was under the influence[,]" and that he had not taken his "medicine and [he] needed to see a psychologist[.]" When asked how the police responded to his assertions, the Petitioner stated that "[t]hey never even tr[ied] to help [him.]" He asserted that he had informed his trial counsel of this information and that he "wanted [trial counsel] to file a motion for suppression and he never filed it." The Petitioner agreed that at trial, his counsel asked the interrogating officers during cross-examination about their interview with the Petitioner, and the Petitioner claimed that the officers responded that "they never really ask people about their mental health history[.]"

## II. *July 10, 2015 Post-Conviction Hearing*

On July 10, 2015, the post-conviction hearing continued. On cross-examination, the Petitioner was asked to explain what happened on the night of the incident involving the victim. The Petitioner testified that he was at the victim's home that night, and that he arrived around 11:00 p.m. He said that he "used [his] key" and "walked right in" the "front door[.]" The Petitioner asserted that the victim was expecting him. He explained that once he was inside the home, he "took . . . a shower and laid down." The Petitioner stated that after he had taken a shower, his "baby mama[, Veronica White,] called [him] about [his] daughter." He said that after he received this phone call from Ms. White, the victim "flipped out[,]" and they "start[ed] arguing[.]" He explained that as they were arguing, the victim "put her hands" on the Petitioner, and they "started wrestling[.]" He claimed that the victim "started kicking [him] and hitting [him] and [he] was trying to leave." He said that he "blacked out and the next thing [he knew], [he was] choking her." He agreed that he "put [his] hands around her throat" and "choke[d] her until she was unconscious." The Petitioner averred that this happened "on the bed in the bedroom" and that after he choked the victim he left the house. He explained that he left the victim's house that night "in her truck" and then went to the home of his brother, James Bledsoe. He explained that he stayed with his brother "when [he] and [the victim got] into it."

Additionally, the Petitioner claimed that he had a sexual relationship with the victim but that they did not have sex on the night of the incident. However, he claimed that he had sex with the victim "three days prior." Furthermore, the Petitioner stated that he had taken "Loxapine," and had used "marijuana" and "heroin" on the day of the incident. He also agreed that he had been "drinking alcohol that night." According to the Petitioner, he was arrested on May 21, 2009.

-10-

The Petitioner testified that upon being arrested, he gave a statement to law enforcement officers at the police station. He explained that he "didn't talk to [the officers] until they told [him] the only way [he] would be able to use the phone was if I talk[ed] to them about what went on." When asked if the officers made threats, the Petitioner responded, "That's the only reason [he] talked to them." He agreed that he made a statement to the police, that they typed it, and that he signed the typed copy. He stated that he gave the statement "because [he] was tired and ready to go lay down" and because he wanted "to be able to call [his] family." He claimed that he "never paid attention" to what was in his statement "because [he] was under the influence" of "marijuana, heroin," and "all type of stuff." He further claimed that the "only thing [he] remember[ed] telling [the police] was that three days before" he and the victim "got into an altercation and [they] had sex." He asserted that he told trial counsel about this interview but that trial counsel "never responded to [his] letters."

The Petitioner was questioned about the type of mental illness he suffered. The Petitioner testified that he had "[m]ajor depression[,] PTSD[, a]nd paranoid schizophrenia." He explained that at "eight or nine", he was diagnosed with major depression, at "eighteen" he was diagnosed with "PTSD[,]" and "in 2006, [he] was diagnosed with paranoid schizophrenia." He asserted that he had taken the following medications for these conditions: "Xanax, Seroquel, Lexapro, Celexa, Prozac," "Thorazine," "Risperdal," and "Depakote." He stated that he was currently taking "Zoloft, Benadryl[,] and Loxapine." The Petitioner agreed that there were times in his life when he did not take his prescribed medications. He explained that "[w]hen he couldn't get [his medications], that's the only time" he did not take them. He acknowledged that he functioned "better" when he took his medications.

The Petitioner claimed that he discussed his mental health with the attorney who represented him while his case was in General Sessions court. He conceded that he knew his attorney "submitted an order to the court to have [him] evaluated for [his] mental health issues" and admitted that he remembered meeting with "the doctors" who performed the evaluation. However, when asked if he knew the results of his evaluation, the Petitioner asserted that he "never knew what . . . the outcome [was]." The Petitioner denied being aware of a letter regarding his mental health evaluation addressed to the General Sessions judge, which stated that the Petitioner "was competent" and had "the ability to talk to [his] lawyer about [his] case."

The Petitioner agreed that the case proceeded after his first mental health evaluation. He acknowledged that he had a preliminary hearing, his case was bound over to the grand jury, and then his case went to criminal court. Additionally, the Petitioner confirmed that he was appointed trial counsel when his case advanced to criminal court. The Petitioner conceded that he discussed the previous mental health evaluation with his

-11-

trial counsel and that trial counsel "decided to have [the Petitioner's] mental health status reviewed[.]" The Petitioner admitted that trial counsel did this upon the Petitioner's request. The Petitioner insisted that he never saw the results of this evaluation and that trial counsel never discussed it with him.

On re-direct, the Petitioner identified a document as his "mental health treatment plan." He stated that the document explained what he was diagnosed with and claimed that he obtained this document by requesting it from the "prison facilities that offer mental health" treatment. The report was entered into evidence in order to show that the Petitioner suffered symptoms of "depression[,]" "nightmares[,]" and "paranoia[.]"

The Petitioner's trial counsel testified that he was appointed to represent the Petitioner in this case. Trial counsel testified that he had been practicing law since 1982 and that he had practiced criminal law since 1989. In response to the Petitioner's testimony, trial counsel testified as follows:

> [The Petitioner] gave me – it was several jail visits by the way, I counted at least five jail visits, at jail property. Mentioned the other day three, today two, but it was at least five. He gave me the names of the [potential witnesses] he [had] mentioned today, telephone numbers. I did not turn those numbers over to investigators to track down for two reasons. One, I wanted to talk to them myself first and I left voicemails at the numbers given me. I had given [the Petitioner] my card any number of times. I return all phone calls. And two, the fact that he might have known her [had] nothing to do with consensual sex on the night alleged, the early morning hours of May 18th, 2009.

On cross-examination, trial counsel acknowledged that he remembered representing the Petitioner and that he remembered "submitting [the Petitioner] for a mental health examination." He explained that he did this "[b]ecause [the Petitioner] had asked that and it [was his] understanding there, that they [were] a little more thorough when they [were] being evaluated for a criminal court judge[.]" He stated that he was not sure if that "was absolutely accurate or not[,]" "[b]ut just in case," trial counsel requested that the Petitioner receive a second mental health evaluation. Regarding the results of the evaluation, trial counsel admitted that he did not "recall ever having sent any client a copy of those letters[,]" but he asserted that he informed the Petitioner that "the doctor said he was A-OK" and competent to stand trial. Furthermore, he agreed that he informed the Petitioner that "whatever his mental health diagnosis" was, it would not have been "a defense to be used at trial."

Additionally, trial counsel testified that he kept the Petitioner informed on the status of his case. Trial counsel asserted that he met with his client at multiple court dates

and discussed what was occurring with the Petitioner. Trial counsel also testified that he sent the Petitioner copies of discovery and kept him informed on developments in his case. He again asserted that he visited the Petitioner in jail "at least five times."

Regarding the potential trial witnesses the Petitioner asked him to call to testify, trial counsel explained,

> [The Petitioner] told me on one of those jail visits that he had met [the victim] on Beale Street once. I asked her about that on cross[-]examination and she denied it. If any of these folks he had given me their names, if they had confirmed that, I would have called them in here. I've called people to the stand five minutes after meeting them. Whether [the prosecutor] would have let me get away with it or not, I don't know, but I would have tried.

Trial counsel insisted that he had "tried personally" to contact these individuals and insisted that "if anything had come of it, [he] would have asked an investigator to talk to [the potential witnesses]." Furthermore, trial counsel did not "recall [the Petitioner's] ever saying [he and the victim] had cohabitated." He testified that he informed the Petitioner that whether or not he knew the victim was "irrelevant to consent[.]" He asserted that he asked the Petitioner if any of these individuals were present "the night [the victim] alleged this happened[,]" and the Petitioner told him that they were not there. Furthermore, he testified that when alibi witnesses [were] family [members], he considered them "less reliable." Despite potentially being less reliable, trial counsel claimed that if he "had thought it would have . . . gone to the issue of consent, mama, daddy, brother, cousin, [he] would have called them."

Trial counsel testified that the physical evidence offered at trial was consistent with the victim's version of events. Trial counsel agreed that her testimony at the preliminary hearing, trial, and her statement to the police "were all very consistent." Also, he averred that the Petitioner's "statement to the police and his story of the events that happened that night, were very consistent with [the victim's] version of events." Trial counsel stated that he "believe[d the Petitioner] said in his statement he didn't know [the victim]." Counsel also testified that when the victim "was asked to do the sketch [of her attacker], there was no picture of [the Petitioner] presented, and again, it was just spot on." Trial counsel agreed that "physical evidence would have been consistent with her testimony of how she regained consciousness and what her situation was at that time."

Additionally, trial counsel explained that the defense theory at trial was that "there was no proof of [sexual] penetration." On re-direct, trial counsel identified a document that was entered into evidence at the Petitioner's trial. The document contained mug shots of six individuals, one of which was circled. There was a handwritten note signed by the victim, which stated, "This is the person that invaded my home, choked me, and

-13-

stole my car." The signed note was dated May 21, 2009. Trial counsel testified that he used this document to support his trial strategy that "there was not penetration."

James Bledose testified and explained that the Petitioner was his "baby brother." He stated that the Petitioner would often stay at his house. When asked if he was "familiar with the Petitioner and the victim[,]" he replied that he knew "they had a few arguments over the phone." On cross-examination, Mr. Bledsoe admitted that he had never met the person the Petitioner would argue with over the telephone. Mr. Bledsoe could not remember exactly when it was that the Petitioner would come over to his house and use the telephone.

Mr. Bledsoe also confirmed that he did not testify at the Petitioner's trial. When asked why, Mr. Bledsoe explained that no one called him and stated that he was supposed to have been "called by a lawyer[,]" but he never received a call. He agreed that he did not attend the Petitioner's trial but testified that he visited his brother in jail "[p]lenty of times."

### III.  August 28, 2015 Post-Conviction Hearing

The post-conviction court continued the hearing to August 28, 2015. On that date, Lois Bledsoe testified that she was the Petitioner's mother. She stated that in May 2009, the Petitioner "had several girlfriends[.]" She knew this because they went "to [her] house." She agreed that she saw "several different girlfriends purporting to be [the Petitioner's] girlfriend that would drive to [her] house[.]" She testified that she did not recall their names.

Additionally, the Petitioner offered further testimony. The Petitioner testified that "if [trial counsel] would have filed the grounds that [the Petitioner] asked according to the defects in the indictment and trial court errors, [the Petitioner] would have probably had a better trial than [he] had." The Petitioner agreed that he wrote to trial counsel "explaining the different things that [he] would have liked [trial counsel] to do." The Petitioner identified a collective exhibit, which consisted of a series of letters the Petitioner sent to trial counsel. The Petitioner explained that the document contained letters to his trial counsel making requests and letters to the "Board of Professional Responsibility" "complaining about [trial counsel's] not responding to [his] request[s]." The letters were entered into evidence.

The Petitioner also raised additional claims at the post-conviction hearing related to a lack of his DNA from the rape kit, trial counsel's failure to retest the victim's underwear, and trial counsel's failure to strike a juror who had been a victim of a robbery. However, he failed to raise those claims on appeal. Thus, those issues are waived. See Tenn. R. App. P. 36(a).

-14-

The post-conviction court subsequently denied the petition. In its order denying the Petitioner relief, the post-conviction court found that the Petitioner offered no proof to support his claim that his trial counsel should have called witnesses to establish that he had a prior relationship with the victim. In its order denying the petition, the court found that

> [The Petitioner] testified that he asked his trial attorney to call Veronica White, his brother James Bledsoe and his mother Lois Bledsoe at trial to show that he knew her, to impeach the victim's credibility. He claimed that although he did not have sex with the victim that night, he did have sex with her three nights before. No proof was offered by the [P]etitioner that he had ever met the victim prior to the rape other than his completely unsupported testimony. His mother, Lois Bledsoe, was called as a witness at the hearing, and could only testify that he had a lot of girlfriends during that time and she could not remember any of their names. Her testimony at trial, if she had been called, would have been completely irrelevant. His brother James testified that he never met the victim or knew her name, but was told by the [P]etitioner that the victim was the lady he had been arguing with on the telephone. This testimony would not have been allowed at trial as inadmissible hearsay. His brother also testified that the [P]etitioner mostly stayed with him for the three years prior to his arrest. The victim was consistent in her 911 call, her statement to first responders on the scene, in her formal statement to the police, in her preliminary hearing testimony and in her trial testimony that she woke up to find the [P]etitioner in her bedroom and had never met him before. She worked with a composite layout artist with the MPD to attempt to produce a portrait of the rapist. In the [P]etitioner's signed confession, he admitted that he did not know her. His trial attorney testified that the [P]etitioner told him that he had only met her once on Beale Street, never alleging that they had an ongoing relationship. Veronica White was never called by the [P]etitioner as a witness for the hearing, even though they apparently have a child together. In general, the only way a petitioner can establish that trial counsel's failure to interview or present a witness in support of his defense at trial inured to his prejudice is to present the witness at the evidentiary hearing. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). This court finds the [P]etitioner totally lacking in credibility on this issue, and finds that this allegation must fail for lack of any credible proof of deficient performance or prejudice to the [P]etitioner."

The Petitioner filed a timely notice of appeal.

ANALYSIS

On appeal, the Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to call potential defense witnesses to testify at trial. The Petitioner also argues that the post-conviction court erred in denying his petition "when it concluded that Petitioner's witness would have been excluded based on its belief that it was inadmissible hearsay." He spends much time in his brief focusing on the fact that the post-conviction court never found that the testimony of James Bledsoe lacked credibility, but that the post-conviction court instead incorrectly concluded that his testimony would have been inadmissible hearsay and not admitted. The State responds that the post-conviction court did not find any of the Petitioner's evidence credible, "which appear[ed] to encompass all of the [Petitioner's] witnesses[.]" The State argues that "[b]ecause this [c]ourt cannot revisit credibility findings, the [post-conviction] court's denial of the petition should be affirmed." The State further argues that "[e]ven assuming the [Petitioner's] brother testified," the Petitioner "cannot show any prejudice." We agree with the State that the Petitioner has failed to establish prejudice.

Furthermore, the Petitioner asserts that he "had mental health issues, which could have easily explained his alleged 'confession' to the police." However, the Petitioner completely fails to support this allegation with argument. Thus, the issue is waived. See Tenn. R. app. P. 27(a)(7); Tenn. Ct. Crim. App. R. 10(b).

*I. Standard of Review*

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the [c]onstitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the trial court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the trial court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

*II. Ineffective Assistance of Counsel*

-16-

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger, 279 S.W.3d at 293 (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. In reviewing counsel's conduct, a "fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Id. at 689. "Thus, the fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. Hellard v. State, 629 S.W. 2d 4, 9 (Tenn. 1982).

Prejudice requires proof of "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id.

Here, the Petitioner has failed to establish that had trial counsel called these potential witnesses to testify there is a reasonable probability that the result of his trial would have been different. The Petitioner argues that trial counsel should have called several potential witnesses to testify that the victim and the Petitioner had a relationship prior to the attack in May 2009. However, one of the Petitioner's potential witnesses, Veronica White, did not testify at the post-conviction hearing. Lois Beldsoe simply testified that the Petitioner had several girlfriends, but she never identified the victim as one of those girlfriends. James Bledsoe testified that the Petitioner argued on the telephone with the victim, but he did not explain how he knew that the person the Petitioner was arguing with was the victim. Additionally, this testimony arose after the

-17-

Petitioner was convicted at trial, and these witnesses were the Petitioner's family members, rendering this testimony less reliable.

Furthermore, weighed against the evidence offered at trial, the probative value of the testimony of these witnesses is minimal. The victim consistently testified that she did not know the Petitioner. Without viewing a photo of the Petitioner, the victim worked with a sketch artist to construct an image of her attacker, which resembled the Petitioner. Also, the Petitioner confessed to choking and raping the victim and then leaving her home in her car. The victim's statement to police and her testimony at the preliminary hearing and trial were congruous with the Petitioner's confession. Moreover, both the victim's testimony and the Petitioner's statement were consistent with the other evidence entered at trial. The Petitioner's fingerprints were found on the victim's kitchen window, and his semen was found in her underwear. We agree with the post-conviction court's conclusion that the Petitioner was unable to show that the result of his trial would have been different had these witnesses testified. Accordingly, the Petitioner is not entitled to relief on this issue.

<u>CONCLUSION</u>

Based upon consideration of the foregoing and the record as a whole, the post-conviction court's denial of the petition for post-conviction relief is affirmed.

_____

D. KELLY THOMAS, JR., JUDGE

-18-